LIONEL Z. GLANCY (#134180)
MICHAEL GOLDBERG (#188669)
ROBERT V. PRONGAY (#270796)
**GLANCY BINKOW & GOLDBERG LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
E-mail: info@glancylaw.com
lglancy@glancylaw.com
mmgoldberg@glancylaw.com
rprongay@glancylaw.com

*Attorneys for Plaintiff Linus Aruliah*
[Additional counsel on signature page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINUS ARULIAH, Individually and On Behalf of All Others Similarly Situated, | Case No.: |
| Plaintiff, | **CLASS ACTION** |
| v. | **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| IMPAX LABORATORIES, INC., LARRY HSU, G. FREDERICK WILKINSON, and BRYAN M. REASONS, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

COMPLAINT

Plaintiff Linus Arulia ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Impax Laboratories, Inc. ("Impax" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants (defined below) who purchased or otherwise acquired Impax securities between May 20, 2013 and July 28, 2014, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against the Company and certain of its top officials.

2.      Impax is a specialty pharmaceutical company engaged in the development, manufacture and marketing of bio-equivalent pharmaceutical products, referred to as generic products, in addition to the development of proprietary branded products.  The Company operates in two segments, referred to as the "Global Pharmaceuticals Division" ("Global Division") and the "Impax Pharmaceuticals Division" ("Impax Division").

3.      The Global Division concentrates on the development, manufacture, sale and distribution of generic products, which are the pharmaceutical and therapeutic equivalents of brand-

name drug products and are usually marketed under nonproprietary drug names rather than by a brand name.  The Impax Division is engaged in the development of proprietary brand pharmaceutical products that purport to represent improvements to already-approved pharmaceutical products addressing the treatment of central nervous system ("CNS") disorders. The Impax Division is also engaged in the sale and distribution of branded Zomig® (zolmitriptan) products, indicated for the treatment of migraine headaches.  Both the Global Division and the Impax Division also generate revenue from research and development services provided to unrelated third-party pharmaceutical entities.

4.      The Company sources finished dosage form products from facilities in Hayward, California and Taiwan.  The Taiwan facility was approved for product manufacturing by the U.S. Food and Drug Administration ("FDA") in September 2009 and by the Taiwan FDA in July 2010. The Taiwan facility currently manufactures 12 products for distribution in the United States.

5.      In addition, the Company currently has one late-stage branded pharmaceutical product candidate being developed internally, RYTARY™ (IPX066), an extended release capsule formulation of carbidopa-levodopa for the symptomatic treatment of Parkinson's disease ("RYTARY").   In February 2012, the FDA accepted the filing of a New Drug Application ("NDA") for RYTARY. Subsequently, the Company received a Complete Response Letter from the FDA in January 2013, indicating that the Company had failed to win approval for its drug RYTARY.

6.      In the Complete Response Letter, the FDA indicated that it required a satisfactory re-inspection of the Company's Hayward manufacturing facility as a result of the warning letter issued in May 2011 due to the facility's involvement in the development of RYTARY and supportive manufacturing and distribution activities. However, during the assessment of the NDA, Impax withdrew the Hayward site as an alternative site of commercial production at launch for RYTARY.

COMPLAINT
2

Concurrently, the Company is working with the FDA on the appropriate next steps for the RYTARY NDA and on resolving the warning letter.

7.      Throughout the Class Period, Defendants made materially false and misleading statements regarding quality control matters at the Company's Taiwan production facility.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that:  (1) the Company failed to maintain proper quality control and manufacturing practices at its Taiwan facility in violation of current Good Manufacturing Practices ("cGMP"); (2) the manufacturing deficiencies at the Taiwan facility could have a material adverse impact on the Company's ability to successfully launch its new drug, RYTARY; (3) the manufacturing deficiencies at the Taiwan facility jeopardized the Company's ability manufacture, sell, and distribute generic pharmaceutical products; and (4) based upon the above, Defendants lacked a reasonable basis for their positive statements about the Company and its outlook, including statements about its ability to launch RYTARY.

8.      On July 29, 2014, Impax announced that the FDA had completed an inspection of the Company's Taiwan facility. The FDA's inspection covered two areas.  First, it covered a Pre-Approval Inspection for RYTARY, given the critical importance of the Taiwan facility to the manufacturing processes of the Company's drug candidate.  And second, it covered a general good manufacturing practices inspection.  Based on its inspection, the FDA issued a Form 483 (a form used by the FDA to document and communicate deficiencies in a company's manufacturing quality-control system), stating that it had found "ten inspectional observations," or deficiencies, at the Taiwan facility.

9.      Concurrently, on July 29, 2013, Impax filed a Form 8-K with the SEC providing a redacted version of the Form 483.

10.      On this news, the Company's shares fell $4.27, or over 15.23%, to close at $23.76 on July 29, 2014.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

14.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as the Company maintains corporate offices in this District.

15.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16.     Plaintiff, as set forth in the attached Certification, acquired Impax securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

17.     Defendant Impax is a specialty pharmaceutical company engaged in the development, manufacture and marketing of bio-equivalent pharmaceutical products in addition to the development of branded products.  Impax maintains its principal executive offices at 30831 Huntwood Avenue, Hayward, California 94544.  The Company trades on the NASDAQ under the ticker symbol "IPXL".

18.     Defendant Larry Hsu ("Hsu") has served at all relevant times until his resignation on April 29, 2014, as the Company's Chief Executive Officer ("CEO"), and President.  Hsu continues to serve on Impax's Board of Directors.

19.     Defendant G. Frederick Wilkinson ("Wilkinson") has served at the Company's President and CEO since April 2014.

20.     Defendant Bryan M. Reasons ("Reasons") has served at all relevant times as the Company's Chief Financial Officer ("CFO") and Senior Vice President, Finance.

21.     The defendants referenced above in ¶¶ 18 – 20 are sometimes referred to herein as the "Individual Defendants."

22.     Defendant Impax and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

23.     Impax, a speciality pharmaceutical company, engages in the development, manufacture, and marketing of bioequivalent pharmaceutical products. The Company operates in two divisions, Global Division and Impax Division.   The Global Division develops, manufactures, sells, and distributes generic pharmaceutical products.   This division provides its generic pharmaceutical prescription products directly to wholesalers and retail drug chains, and generic pharmaceutical over-the-counter and prescription products through unrelated third-party pharmaceutical entities, in addition to offering research and development services.   The Impax Division develops proprietary brand pharmaceutical products for the treatment of central nervous system disorders, including epilepsy, migraine, multiple sclerosis, Parkinson's disease, and restless leg syndrome, and promotes third-party branded pharmaceutical products. Impax markets and sells its generic pharmaceutical prescription drug products in the continental United States and the Commonwealth of Puerto Rico.

24.     Impax has historically focused on generic drugs, which offer significantly lower margins than branded drugs.  In 2008, the Company launched its branded products division in an effort to diversify its revenue base.  RYTARY, also known as IPX066, is the first drug that Impax sought to take through the entire FDA approval process for a new pharmaceutical.

25.     Impax has two manufacturing facilities, one in Hayward, California, where the Company is based, and one in Taiwan.

26.     The FDA and Impax have been at odds over the Company's Hayward facility since at least 2010.  On June 3, 2011, Impax received a warning letter from the FDA, dated May 31, 2011, related to an inspection the FDA conducted of its Hayward facility between December 13, 2010 and January 21, 2011.  The warning letter cited violations of cGMP.  CGMPs for human pharmaceuticals are regulations enforced by the FDA and govern manufacturing processes, stability testing, record keeping and quality standards.  The May 2011 warning letter cited problems in Impax's sampling and testing of in-process materials and drug production, its production record review and its process for investigating the failure of certain manufacturing batches to meet specifications.

27.     During the first quarter of 2012, the FDA conducted a further investigation of the Hayward facility in connection with the May 2011 warning letter and a general GMP inspection. In connection with the GMP inspection, the FDA issued a Form 483 in May 2012.  A Form 483 "Notice of Inspectional Observations" is a form used by the FDA to document and communicate deficiencies in a company's quality control system discovered during an on-site inspection. According to the FDA, a satisfactory re-inspection of the Hayward facility would be required in order to resolve the issues raised in the May 2011 warning letter.

28.     Subsequently, the Company received a Complete Response Letter from the FDA in January 2013 in connection with the NDA for RYTARY filed by the Company in February 2012.  In the Complete Response Letter, the FDA indicated that it still required a satisfactory re-inspection of the

Company's Hayward manufacturing facility as a result of the warning letter issued in May 2011 due to the facility's involvement in the development of RYTARY and supportive manufacturing and distribution activities. However, during the assessment of the NDA, Impax withdrew the Hayward site as an alternative site of commercial production at launch for RYTARY, thereby relying almost completely on its Taiwan facility.  The Company is currently working with the FDA on the appropriate next steps for the RYTARY NDA and on resolving the warning letter.

29.     Concurrently, the Company has continued to expand its operations at the Taiwan manufacturing facility.  Impax finished the installation process and received approval from the FDA for product manufacturing at the facility during 2009.  The Company subsequently initiated construction of an expansion to the Taiwan facility and has expanded in stages.  As of February 2014, the second phase of the expansion was nearing completion and Impax began manufacturing trial batches of products during the first half of 2014 as needed to support market demand for such products.  A major portion of this second phase expansion was dedicated to the production of the Company's product candidate, RYTARY.

30.     Moreover, the Company completed transfer of a substantial portion of its Hayward production to Taiwan during 2013.  The Company currently plans to continue to increase aggregate production at the Taiwan facility to up to 500 million tablets and capsules, as well as increase the number of different products manufactured at the facility during 2014.

**Materially False And Misleading Statements Issued During the Class Period**

31.     On May 20, 2013, the first day of the Class Period, the Company issued a press release entitled "Impax Board of Directors Establishes Compliance Committee", announcing that the Board of Directors had established a Compliance Committee composed of three independent directors to provide oversight for all activities of the Company related to the U.S. Food and Drug Administration (FDA) warning letter regarding the Hayward site including obtaining approval of the Company's New Drug

Application for an investigational drug, RYTARY. The press release also stated that the "[t]he Committee will also provide oversight for the Company's Quality Improvement Program (QIP) with respect to change management, training, documentation, investigation, validation and risk assessments in response to the FDA 483s."

32. On August 8, 2013, Impax issued a press release announcing its second quarter 2013 financial results. The Company reported net income of $15.92 million, or $0.23 diluted earnings per share ("EPS"), for the second quarter of 2013. The release stated in part:

> "We were able to offset some of the revenue decline by successfully capturing sales and segment share with our non-AB rated oxymorphone hydrochloride extended-release products during our 180-day exclusivity period that expired in early July of this year," said Larry Hsu, Ph.D., president and CEO, Impax Laboratories, Inc. "However, until we are able to close out the warning letter at our Hayward facility, we expect continued delays in receiving approval for a number of products pending at the FDA that could drive future growth. The absence of new product approvals, combined with additional generic competition and significant segment erosion of Zomig's two largest dosage forms, will likely result in operating losses in the second half of this year."
>
> "***We continue to implement quality improvements across our facilities and remain committed to resolving all observations in the most recent Form 483 and exceeding current Good Manufacturing Practices. With a generic pipeline of 44 products pending approval at the FDA and our pending New Drug Application for RYTARYTM, as well as significant financial resources available for strategic external opportunities, I remain optimistic about the future of Impax***," concluded Dr. Hsu.

33. On August 9, 2013, Impax filed with the SEC its Form 10-Q for its second quarter ended June 30, 2013, which was signed by defendant Hsu and reiterated the results previously reported in the Company's August 8, 2013 press release. The Form 10-Q stated in part:

> We have taken a number of steps to thoroughly review our quality control and manufacturing systems and standards and are working with several third-party experts to assist us with our review and assist in enhancing such systems and standards. This work is ongoing and we are committed to improving our quality control and manufacturing practices.

34.     On November 4, 2013, Impax issued a press release announcing its third quarter 2013 financial results.  The Company reported net income of $16.6 million, or $0.25 diluted EPS, for the third quarter of 2013.  The press release stated in part:

> "We were able to reduce some of the third quarter 2013 decline by capturing sales with our authorized generic Trilipix® products, which we launched in mid-July. In addition, new competition on a few generic products had a less than expected impact on this quarter's sales," said Larry Hsu, Ph.D., president and chief executive officer of Impax Laboratories. "However, we anticipate that our fourth quarter revenues may very well be negatively impacted by this additional competition and lower authorized generic Trilipix product sales following our strong launch, compared to this quarter."
>
> In late October 2013, at the U.S. Food and Drug Administration's (FDA) request, the Company participated in a regulatory meeting with representatives of the FDA to provide additional information and clarifications on the Company's responses and updates related to the Form 483 issued in 2013. The Company will continue to provide information to the agency about its quality and manufacturing improvement programs and has committed to answering any questions FDA might have on any applications or programs. The Company believes that a satisfactory re-inspection of the Company's Hayward manufacturing facility would be required to close out the warning letter and resolve the 2013 Form 483 observations. The FDA did not notify the Company at the meeting of any additional enforcement actions; however, no assurance can be given as to whether the FDA will take any further actions.
>
> "***We continue to spend to improve our manufacturing and quality systems and advance our Quality Improvement Program. Despite our recent challenges, we have the financial resources to invest internally and externally to execute on our growth strategy***," concluded Dr. Hsu.

35.     On November 5, 2013, Impax filed with the SEC its Form 10-Q for its third quarter ended September 30, 2013, which was signed by defendants Hsu and Reasons, and reiterated the results previously reported in the Company's November 4, 2013 press release. The Form 10-Q stated in part:

> We have taken a number of steps to thoroughly review our quality control and manufacturing systems and standards and are working with several third-party experts to assist us with our review and assist in enhancing such systems and standards. This work is ongoing and we are committed to improving our quality control and manufacturing practices.

36.     On February 20, 2014, Impax issued a press release announcing its fourth quarter and full year 2013 financial results. The Company reported an adjusted net loss of $1.6 million,

or ($0.02) diluted EPS, for the fourth quarter of 2013.  Additionally, the Company reported adjusted net income of $56.1 million or $0.82 diluted EPS, for the full year 2013.  The release stated in part:

> "*We continue to dedicate significant resources to improve our manufacturing and quality systems and advance our Quality Improvement Program*," said Larry Hsu, Ph.D., president and chief executive officer of Impax Laboratories, Inc. "At the same time, we have successfully commercialized a number of new product opportunities as a result of prior investments in R&D and business development."

> "We are currently planning to begin marketing and selling our allotment of a specified number of bottles of authorized generic RENVELA tablets beginning in mid-April 2014. In addition, we continue to pursue FDA approval of our pending Abbreviated New Drug Applications, including for generic RENVELA, as well as the re-filing of a New Drug Application for RYTARYTM," concluded Dr. Hsu.

37.    On February 25, 2014, Impax filed with the SEC its Form 10-K for its fiscal year ended December 31, 2013, which was signed by, among other, defendants Hsu and Reasons, and reiterated the results previously reported in the Company's February 20, 2014 press release.  The Form 10-K stated in part:

> We have taken a number of steps to thoroughly review our quality control and manufacturing systems and standards and are working with several third-party experts to assist us with our review and assist in enhancing such systems and standards. This work is ongoing and we are committed to improving our quality control and manufacturing practices.

38.    With regard to the Taiwan facility and NDA application specifically, the Form 10-K stated in part:

> We completed construction of a new manufacturing facility in Taiwan, installed equipment and received FDA approval of the facility during 2009. We initiated construction of an expansion to the Taiwan facility during 2009 and have expanded the facility in stages. As of February 2014, the second phase of the expansion is nearing completion and we intend to begin manufacturing trial batches of products during the first half of 2014 as needed to support market demand for such products. *A major portion of this second phase expansion was dedicated to the production of our internally developed late stage branded pharmaceutical product candidate, RYTARY™ for the symptomatic treatment of Parkinson's disease, for which the NDA was accepted for filing by the FDA in February 2012 and which we are working with the FDA on the appropriate next steps in response to the Complete Response Letter we received from the FDA in January 2013*. We completed transfer of a substantial portion of our

COMPLAINT
10

Hayward, California production to the lower cost production site in Taiwan during 2013 to create capacity for new products being launched from the Hayward facility. We currently plan to continue to increase aggregate production at our Taiwan facility to up to 500 million tablets and capsules, as well as increase the number of different products manufactured at the facility during 2014. See also "Item 15. Exhibits and Financial Statement Schedules — Note 17. Segment Information and Note 18. Commitments and Contingencies" for a discussion of our Taiwan facility.

***We believe we have sufficient capacity to produce our products for the future***.

39.     On April 2, 2014, Impax issued a press release entitled "Impax Laboratories Announces the Alignment of Quality and Manufacturing Operations Under the Leadership of Jeffrey D. Nornhold", which stated, in part:

**Enhances Efficiencies and Aligns Organization for Future Growth Plans**

HAYWARD, Calif., April 2, 2014 /PRNewswire/ --Impax Laboratories, Inc. (NASDAQ: IPXL) today announced that Jeffrey D. Nornhold has been appointed Senior Vice President, Technical Operations and will oversee the Company's manufacturing, supply chain, quality and technical operations. Mr. Nornhold previously served as the Company's Senior Vice President, Global Quality Affairs since March 2011.

Mark Fitch, Senior Vice President, Global Operations announced his plans to retire, but will continue to work with Nornhold to ensure a smooth transition. Since joining Impax in June of 2011, Fitch has partnered with Nornhold to enhance the Company's manufacturing and quality areas, and improve operating efficiencies. This includes improvements to the Company's Hayward facility, expansion of the Taiwan facility, the transfer of numerous currently approved and manufactured products from Hayward to Taiwan and building a highly qualified leadership team.

"Working alongside Mark the past three years has been a great experience," said Nornhold. "We have collaborated on enhancing and improving the critical areas of quality, manufacturing and compliance."

"Jeff has done an outstanding job of building a highly skilled internal quality organization and establishing the foundation for sustainable quality and compliance", said Larry Hsu, Ph.D., President and CEO of Impax Laboratories. "We believe Jeff is the ideal person to manage this new structure, and effectively drive compliance, efficiencies and collaboration across these key business functions."

Mr. Nornhold has over 24 years of experience in pharmaceutical manufacturing and related technical operations. Prior to joining Impax in 2011, he gained a significant amount of Technical Operations experience at Watson Pharmaceuticals (now Actavis plc), serving as Vice President, Quality Operations - International, and was responsible for manufacturing sites for both dosage and active pharmaceutical ingredients outside of the U.S. He also served as Vice President, U.S. Quality Operations at Watson, leading the

development and execution of quality initiatives for all U.S. sites. Prior to joining Watson in 2000, he held numerous leadership positions within the pharmaceuticals industry.

40.  On April 11, 2014, the Company issued a press release entitled "Impax Pharmaceuticals Resubmits New Drug Application for RYTARY™ (Carbidopa and Levodopa) Extended-Release Capsules (IPX066)", which stated in part:

> HAYWARD, Calif., April 11, 2014 /PRNewswire/ -- Impax Pharmaceuticals, a division of Impax Laboratories, Inc. (NASDAQ: IPXL), announced today the resubmission of Impax's New Drug Application (NDA) for RYTARY (IPX066) to the U.S. Food and Drug Administration (FDA). IPX066 is a patented extended- release capsule formulation of carbidopa and levodopa, an investigational drug for the symptomatic treatment of Parkinson's disease (PD).

> After discussions with the FDA, the Company has resubmitted the NDA for RYTARY providing updated safety and stability information. ***The FDA will require an inspection of manufacturing facilities involved in the production of RYTARY in connection with the resubmission***. The FDA has designated the NDA filing for RYTARY as a Class 2 resubmission for review purposes and has 14 calendar days to officially accept the NDA resubmission.

> "***We are excited to resubmit the updated NDA for RYTARY and remain enthusiastic about the potential commercial opportunity for the product***," said Michael Nestor, president of Impax Pharmaceuticals.

41.  On May 1, 2014, the Company issued a press release announcing its first quarter 2014 financial results.  The Company reported net income of $16.5 million, or $0.24 diluted EPS, for the first quarter of 2014.   The press release stated in part:

> "Our generics business is benefitting from recent marketing initiatives, as well as consistent success in commercializing the existing portfolio of products and capitalizing on new product launches," said Fred Wilkinson, president and chief executive officer of Impax Laboratories, Inc. "These events resulted in a $21.7 million increase in sales of our Global labeled products since the fourth quarter of 2013. In addition, we recently launched authorized generic RENVELA® and expect it to be a significant contributor to our 2014 results."

> "***A few weeks ago we resubmitted the New Drug Application (NDA) for RYTARY™. The U.S. Food and Drug Administration (FDA) has accepted the application and set the review date under the Prescription Drug User Fee Act (PDUFA) of October 9, 2014. We remain committed to bringing this new treatment option to patients who are suffering from Parkinson's disease***."

"My management team and I will be focused on continuing the plan towards resolving the FDA quality and manufacturing issues in Hayward, while emphasizing the importance of a world class quality organization. We will leverage our resources to ensure we are capitalizing on the strategies related to the brand and generic businesses, and analyze our internal pipeline to identify opportunities for improvement and growth."

"We will be looking to expand our product offerings and portfolio with strategic business development projects by utilizing our financial resources and balance sheet. I am confident we will drive growth and build value for our employees and stockholders."

42.     On May 2, 2014, Impax filed with the SEC its Form 10-Q for its first quarter ended March 31, 2014, which was signed by defendants Wilkinson and Reasons, and reiterated the results previously reported in the Company's May 1, 2014 press release. The Form 10-Q stated in part:

We have taken a number of steps to thoroughly review our quality control and manufacturing systems and standards and are working with several third-party experts to assist us with our review and assist in enhancing such systems and standards. This work is ongoing and we are committed to improving our quality control and manufacturing practices.

43.     The statements referenced in ¶¶ 31 – 42 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the quality control at the Company's Taiwan production facility, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that:  (1) the Company failed to maintain proper quality control and manufacturing practices at its Taiwan facility in violation of current Good Manufacturing Practices ("cGMP"); (2) the manufacturing deficiencies at the Taiwan facility jeopardized the Company's ability to successfully launch its new drug, RYTARY; (3) the manufacturing deficiencies at the Taiwan facility jeopardized the Company's ability manufacture, sell, and distribute generic pharmaceutical products; and (4) based upon the above, Defendants lacked a reasonable basis for their positive statements about the Company and its outlook, including statements about its ability to launch RYTARY.

**The Truth Emerges**

44.     On July 29, 2014, Impax announced that the FDA had completed an inspection of the Company's Taiwan facility. The FDA's inspection covered two areas.  First, it covered a Pre-Approval Inspection for RYTARY, given the critical importance of the Taiwan facility to the manufacturing processes of the drug candidate.   Additionally, it covered a general good manufacturing practices inspection.   Based on its inspection, the FDA issued a Form 483, noting "ten inspectional observations," or deficiencies, at the Taiwan facility.

45.     On this news, the Company's shares fell $4.27, or over 15.23%, to close at $23.76 on July 29, 2014.

46.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

47.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Impax securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.   Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

48.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Impax securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the

proposed Class. Record owners and other members of the Class may be identified from records maintained by Impax or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

49. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

50. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

51. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Impax;

- whether the Individual Defendants caused Impax to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Impax securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

52. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

1  individual litigation make it impossible for members of the Class to individually redress the wrongs

2  done to them. There will be no difficulty in the management of this action as a class action.

3      53.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-

4  the-market doctrine in that:

5      •      Defendants made public misrepresentations or failed to disclose material facts during the

6             Class Period;

7      •      the omissions and misrepresentations were material;

8

9      •      Impax securities are traded in an efficient market;

10     •      the Company's shares were liquid and traded with moderate to heavy volume during the

11            Class Period;

12     •      the Company traded on the NASDAQ and was covered by multiple analysts;

13

14     •      the misrepresentations and omissions alleged would tend to induce a reasonable investor

15            to misjudge the value of the Company's securities; and

16     •      Plaintiff and members of the Class purchased, acquired and/or sold Impax securities
              between the time the Defendants failed to disclose or misrepresented material facts and
              the time the true facts were disclosed, without knowledge of the omitted or
              misrepresented facts.

17     54.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a

18 presumption of reliance upon the integrity of the market.

19     55.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of

20 reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United*

21 *States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class

22 Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Against All Defendants For Violations of
Section 10(b) And Rule 10b-5 Promulgated Thereunder)**

     56.     Plaintiff repeats and realleges each and every allegation contained above as if fully set

forth herein.

57.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

58.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Impax securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Impax securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

59.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Impax securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Impax's finances and business prospects.

60.    By virtue of their positions at Impax, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless

disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

61.    Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Impax securities from their personal portfolios.

62.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Impax, the Individual Defendants had knowledge of the details of Impax's internal affairs.

63.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Impax.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Impax's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Impax securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Impax's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Impax securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

64.      During the Class Period, Impax securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Impax securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Impax securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Impax securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

65.      By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

66.      As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

67.      Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

68.      During the Class Period, the Individual Defendants participated in the operation and management of Impax, and conducted and participated, directly and indirectly, in the conduct of

Impax's business affairs.  Because of their senior positions, they knew the adverse non-public information about Impax's misstatement regarding the quality control at its Taiwan facilities.

69.  As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Impax's business practices, and to correct promptly any public statements issued by Impax which had become materially false or misleading.

70.  Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Impax disseminated in the marketplace during the Class Period concerning the quality and maintenance control at Impax's Taiwan facility.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Impax to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Impax within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Impax securities.

71.  Each of the Individual Defendants, therefore, acted as a controlling person of Impax.  By reason of their senior management positions and/or being directors of Impax, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Impax to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Impax and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

72.  By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Impax.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as his reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: August 13, 2014

**GLANCY BINKOW & GOLDBERG LLP**

By: *s/ Robert V. Prongay*
Lionel Z. Glancy
Michael Goldberg
Robert V. Prongay
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160

**POMERANTZ LLP**
Jeremy A. Lieberman
Francis P. McConville
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile:  (212) 661-8665

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.    I, Linus Aruliah, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.   I have reviewed a Complaint against Impax Laboratories Inc. ("Impax" or the "Company") and, authorize the filing of a comparable complaint on my behalf.

3.   I did not purchase or acquire Impax securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired Impax securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.   To the best of my current knowledge, the attached sheet lists all of my transactions in Impax securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.

Executed:   __August 12, 2014__
         (Date)

(Signature)

__Linus Aruliah__
(Type or Print Name)

## SUMMARY OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES | PRICE PER SHARE |
|------|------------------|------------------|-----------------|
| 7/28/2014 | Purchase | 1000 | 27.81 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |